**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00555 (RCL)** |
| **v.** | : | |
| | : | |
| **PAMELA ANNE HEMPHILL,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Pamela Anne Hemphill ("Hemphill") to 60 days' incarceration, 36 months' probation, 60 hours of community service, and $500 restitution.[1]

I.     **Introduction**

The defendant, Pamela Anne Hemphill, a resident of Boise, Idaho, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of

---

[1] A period of probation after a term of incarceration would be appropriate in the defendant's case. The general prohibition against sentences that combine continuous incarceration and a term of probation, *see* 18 U.S.C. § 3551(b), does not apply where, as here, the defendant is sentenced for a petty offense, *see* 18 U.S.C. § 3561(a)(3); *United States v. Posley*, 351 F. App'x 801, 809 (4th Cir. 2009); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case).

power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars in losses.[2]

On January 21, 2022, Hemphill pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  As explained herein, a sentence of sixty days' imprisonment, with probation to follow, is appropriate in this case because: (1) the defendant deliberately pushed through police lines protecting the East front of the Capitol on three different occasions, and when stopped by law enforcement officers, she used her age as an excuse and distracted officers from their duty protecting Congress and the Capitol, while they attended to her instead; (2) the defendant encouraged other rioters to overrun the police line and enter the Capitol Building; (3) the defendant entered and remained in the Rotunda of the Capitol Building, despite clear signs of violent entry, including broken glass in the door, broken windows on either side and an audible alarm; (4) after being escorted out of the Capitol Building by a law enforcement officer, the defendant remained with a crowd of other rioters just outside the Rotunda doors for more than 30 minutes; and (5) this was the defendant's second instance of participation in a riot that breached a police line and damaged property in a capitol building—she was also a part of the riot that broke into the Idaho Statehouse in August 2020.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings.  But for her actions alongside so many others, the riot likely would have failed.  Here, the defendant's

---

[2] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

participation in a riot that actually succeeded in halting the Congressional certification combined with the defendant's persistent efforts to break through police lines around the Capitol and enter the restricted areas, her repeated encouragement of other rioters, and her lack of remorse, renders a jail sentence both necessary and appropriate in this case.

## II.    Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 26 (Statement of Offense), at 1-7.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

*Pamela Anne Hemphill's Role in the January 6, 2021 Attack on the Capitol*

On December 28, 2020, Hemphill posted the below encouragement to go to Washington, D.C. for January 6th, saying "its a WAR!"



Exhibit 1

The above post was followed by the New Year's Facebook post below, in which she appears to be holding a firearm.



Exhibit 2

On January 5, 2021, Hemphill flew to Washington, D.C. from Idaho.  On that same evening, she attended an outdoor event in Washington, D.C., where she filmed her interactions with the crowd.  In the video, Hemphill can be heard telling one man in the crowd, "Let's do this; let's go to the Capitol. We did it in Boise."  This is a reference to the storming of the Idaho Statehouse by protestors of COVID-19 restrictions on August 24, 2020, which involved Ammon Bundy and resulted in the shattering of a glass door in the Statehouse, as protestors pushed past law enforcement officers to enter the gallery of the building.  Hemphill was involved in the Idaho Statehouse breach and videoed the incident from the front of the crowd. *See* Ex. 11 (identifying herself as the videographer at 00:02 and showing the glass breaking in the door at 14:32).

In her January 5, 2021 video from Washington, D.C., Hemphill said, "We broke the glass door [in Boise]. Watch the video. I'm with People's Rights Ammon Bundy."  Later in the video, Hemphill said, "and I'm going in the Capitol," a statement she repeated and then advised others in the crowd to "occupy the Capitol."  Hemphill ended her January 5 video saying, "Don't worry, Trump's coming in office."

On January 6, 2021, Hemphill walked to the Capitol building and was in the front of the crowd that confronted U.S. Capitol Police and other law enforcement officers assisting them in their attempt to keep the rioters behind the metal barriers set up to keep them out of the restricted area on the East side of the Capitol grounds.

Hemphill filmed herself passing through the barriers for the first time on January 6, while other rioters pushed against them. *See* Ex. 3 at 12:47.  When approached by a law enforcement officer, Hemphill tried to convince the officer to let her stay inside the barrier, claiming she feared injury from the crowd that was pushing against the bike-racks.  After the officer told Hemphill to go back behind the barriers at a different spot, Hemphill rejoined the crowd, but encouraged others to break through the barrier on her way back, saying, "You just gotta come in…. It's your house. Come on in." *Id*. at 15:25-16:36.  A still shot from this video is below.



Exhibit 3-1

Hemphill was at the front of the line of rioters who pushed through the barriers on the East side of the Capitol Building a second time, having repositioned herself after being sent back behind the barriers the first time.  She continued to film the other rioters as they broke through. *See* Ex. 4 at 3:30.  A still shot from her video of this breach is below:



Exhibit 4-1

An image of her progress across the East Plaza toward the Capitol Building is below.



Exhibit 4-2

Hemphill breached the police line a third time a few minutes later at the steps in front of

the East Rotunda doors at the center of the Capitol Building. *Id*. at 6:00-6:45. A still shot of the

moments before this breach taken from the video she filmed is below.



Exhibit 4-3

Hemphill fell to her knees as the rioters pushed through the line and was helped up by a law enforcement officer.  Law enforcement officers assisted Hemphill to the side of the steps, but Hemphill refused to leave the steps when instructed to do so by another U.S. Capitol Police officer who was trying to get her out of the crowd. *See* Ex. 4 at 7:00-9:00.  Hemphill remained on the steps of the Capitol building for at least another 20 minutes, while rioters streamed by, making no effort to distance herself from the mob.

Hemphill subsequently walked up the steps to the East Rotunda doors of the Capitol Building unassisted, saying, "I got pushed over and got my glasses broke, but I got on the top of the Capitol…. I was the first one up here." Ex. 5 at 00:06 and 2:17.  At several points on her way to the doors, Hemphill told other rioters, "I want to go in." Ex. 6 at 9:25 and 10:07.

At approximately 3:01 p.m. on January 6, 2021, Hemphill voluntarily entered the Capitol building through the East Rotunda doors along with other rioters. *Id*. at 10:58.  Hemphill filmed her progress into the Capitol building and through the Rotunda with her cellular phone.  A still

image from this video of her entering the Capitol Building is below.  On the video, there is an audible alarm sounding. *Id*. at 8:48-11:10.



Exhibit 6-1

The U.S. Capitol Police video surveillance system also captured an image of Hemphill entering the building, as seen below.



Exhibit 7

In this video, Hemphill can be seen wearing a dark coat with a hood, a blue baseball cap and a pink scarf.

Additional video footage obtained from the Capitol Police shows Hemphill in the Rotunda of the Capitol Building, as seen in the still shot below:



Exhibit 8

In this video, Hemphill is still holding up a selfie stick with attached phone.

After leaving the Capitol Rotunda at approximately 3:10 p.m., Hemphill asked an officer to help her leave the Capitol Building, again claiming fear of injury from the crowd, and the officer escorted her out. *See* Ex. 6 at 20:40.  Further video footage obtained from the U.S. Capitol Police shows Hemphill being taken out of the Capitol Building by the law enforcement officer, as seen in the still shot below.



Exhibit 9

After exiting the Capitol building through the House South entrance, Hemphill returned to the exterior of the East Rotunda doors and remained there for at least an additional 37 minutes, filming the rioters at they screamed at the officers inside the East Rotunda doors and conversing with other rioters. *See* Ex. 10.  A still shot from video she filmed there is below.



Exhibit 10-1

Hemphill boasted that she had been in the Capitol Building and "was the first one up here." *Id.* at 1:17. In contemplating the broken glass in the East Rotunda door, Hemphill said she had "brok[en] the same glass in Boise, Idaho," referring to the breach of the Statehouse in August 2020. *Id*. at 2:20.

*Hemphill's Interview*

Hemphill voluntarily agreed to an interview with the FBI at the time of her arrest. During the interview, Hemphill falsely claimed that she had been pushed into the Capitol by other rioters. Hemphill claimed that she was a victim of the breach, that she did not feel she had broken any law, and that she had not done anything wrong. Hemphill claimed that what happed on January 6 was not her fault. Hemphill in fact falsely claimed that she had helped the law enforcement officers that day by trying to keep rioters out of the Capitol.

*The Charges and Plea Agreement*

On August 2, 2021, Pamela Anne Hemphill was charged by complaint with violating 18 U.S.C. § 1752(a)(1) & (a)(2) and 40 U.S.C. § 5104(e)(2)(D) & (G).  On August 3, 2021, she was arrested at her home in Idaho.  On September 1, 2021, Hemphill was charged by four-count Information with violations of 18 U.S.C. § 1752(a)(1) & (a)(2) and 40 U.S.C. § 5104(e)(2)(D) & (G).  On January 21, 2022, she pleaded guilty to Count Four of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G), Disorderly Conduct in the Capitol Building.  By plea agreement, Hemphill agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

The defendant now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000.  The defendant must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with

similar records who have been found guilty of similar conduct. § 3553(a)(6).  In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum.  This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated

sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct.  The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants.

Hemphill was prepared to break into and occupy the Capitol when she traveled to the Capitol Building on January 6, 2021.  She encouraged others to come to the Capitol for a "WAR" on social media, even before she arrived, and further encouraged others out in Washington, D.C. on the evening of January 5 to "occupy the Capitol" and break the glass like they did in Boise.  In fact, Hemphill may be the only defendant to be sentenced by the court so far who participated in not one, but two capitol building breaches within a year, considering her participation in the Idaho Statehouse riot on August 24, 2020 and the January 6 riot in Washington, D.C.

At the Capitol on January 6, Hemphill breached the police line protecting Congress and the Capitol Building not once, but three times, and encouraged others to do the same.  Hemphill ignored law enforcement admonishments to leave the restricted area repeatedly, and publicly noted approval of breaking "the glass" like she had in Idaho.

While she spent only a little over ten minutes in the Capitol Building that day, Hemphill clearly knew that she was not authorized to enter the building at all, based on the three police lines she had to cross to get to the door, the broken glass she had to pass to enter, and the audible alarm blaring from the building.  Despite these signs of violent entry, Hemphill walked directly through

the East Rotunda door, and moved into the Rotunda itself.  Then she stayed on Capitol Grounds filming the riot after she was escorted out of the Capitol Building by law enforcement.

Hemphill's statements after January 6 show a lack of remorse.  When she was interviewed by the FBI, she claimed that she had been pushed into the building – a claim for which there is no support, considering she filmed her own voluntary entry.  Worse, she claimed she had been a victim of the riot in which she was more than a willing participant.

Hemphill's statements on video during the attack likewise demonstrate a lack of remorse. Hemphill bragged about breaching police lines, saying she was "the first one behind the gate."  In contemplating the broken glass in the East Rotunda door, Hemphill noted that she had "broken the same glass in Boise, Idaho."

More importantly, Hemphill encouraged other rioters who were behind police lines to "come in…. It's your house.  Come on in."  Hemphill encouraged the other rioters to breach the lines on her first foray into the restricted area, and on her second.  Hemphill therefore bears a special responsibility for this unparalleled crime because she emboldened the rioters who came behind her and was therefore at least partially responsible for the large crowd that overwhelmed the police officers through both violence and sheer numbers.

Hemphill explained on Facebook that her purpose was to fight for former President Trump and even advocated "WAR" in that respect.  Hemphill's actions on January 6 and her prior activities related to the breach of the Idaho Statehouse show a clear line of belief backed by action that demonstrate a very real possibility of similar future criminal conduct and impel the government to seek a jail sentence in this case.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.   The History and Characteristics of the Defendant

As set forth in the PSR, Hemphill has no criminal convictions. ECF 30 ¶¶ 34-35.  Hemphill reported to the PSR writer that she had been a drug and alcohol counselor until 2011, at which time she became unemployed and remains so today.  Hemphill has been compliant with her conditions of pre-trial release.

Importantly, as Hemphill noted in her numerous videos from the Capitol on January 5th and 6th, 2021, January 6 was not the first time she had been associated with breaking into a capitol building.  Hemphill has been involved with Ammon Bundy and the People's Rights movement in Idaho, a far-right group that was involved in the storming of the Idaho Statehouse on August 24, 2020.[3]  She was part of the crowd that stormed the Statehouse that day, and she filmed the angry mob as it pushed through law enforcement officers to gain access to the gallery, breaking a glass door in the process.  Hemphill made numerous references to that incident when encouraging other January 6 rioters to breach police lines and occupy the U.S. Capitol Building.  The fact that Hemphill had been associated with a prior breach and then encouraged others to break into the Capitol Building in Washington, D.C. demonstrates a real need for specific deterrence in the form of incarceration.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and

---

[3] Rebecca Boone, *Boise Woman Charged in Connection with January 6 Insurrection*, AP News, Aug. 4, 2021, *available at* https://apnews.com/article/boise-d34b304b367290b97eddab85ab4d2fa2; *see also* Keith Ridler, *Spectators shatter glass door to get into Idaho Legislative session*, Associated Press, Aug. 24, 2020, *available a*t https://www.spokesman.com/stories/2020/aug/24/spectators-shatter-glass-door-to-get-into-idaho-le/.

appalling disregard for our institutions of government and the orderly administration of the democratic process."[4]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf.

> [the defendant] and others caused that day goes way beyond the several-hour delay
> in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing); *see also United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Pamela Anne Hemphill's prior conduct, her words, post-arrest interview, and statements on social media clearly demonstrate the need for specific deterrence for this defendant. Hemphill encouraged the crowd that broke through the police lines on multiple occasions; she celebrated the violence, comparing it to the earlier breach of the Idaho Statehouse; she unlawfully entered the Capitol Building with a horde of rioters; and she ignored the blaring alarm resonating through the Capitol.

As of the date of this filing, Hemphill has not expressed remorse. When interviewed by the FBI at the time of her arrest, she asserted that she had been a victim of the riot, when in fact she had encouraged others to break into the Capitol. She stated that she had done nothing wrong.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[6] Indeed, the government agrees

---

[5] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna*

with this Court's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The defendant has pleaded guilty to Count Four of the Information, charging her with parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of participation in the breach, etc.—help explain the

---

*Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

differing recommendations and sentences.   And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators.   In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006).   "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").   Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007).   The Capitol breach was *sui generis*: a mass crime with

significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims.  Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent.  The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed on Frank Scavo for reference.  In *United States v. Frank J. Scavo*, 1:21-CR-254 (RCL), this court sentenced Scavo to 60 days' incarceration for violation of 40 U.S.C.§ 5104(e)(2)(G).  Like Hemphill, Scavo entered the Capitol through the Rotunda doors, where multiple assaults on law enforcement occurred, some of which Scavo captured on his cellphone.  Also like Hemphill, Scavo was only inside of the Capitol for a short period of time, approximately 10 minutes, and he falsely claimed that he was pushed inside the Capitol and was unable to resist without being trampled.  Scavo, like Hemphill, had no prior convictions at the time of sentencing.  Unlike Hemphill, Scavo did not participate a prior riot at a state capitol building or incite others to breach police lines prior to entering the U.S. Capitol Building.  In that respect, Hemphill's conduct is more blameworthy.

More generally, the United States has recommended, and judges have often imposed, jail time in cases where the defendant witnessed confrontations with law enforcement before entering

the Capitol or refused to follow the directions of law enforcement. *See, e.g., United States v. Register*, 1:21-cr-00349 (TJK) (75 days' incarceration where the defendant waved the crowd towards an access point, entered the U.S. Capitol past broken windows and ignored officers' attempts to clear him and others from the building); *United States v. James Little*, 1:21-cr-315 (RCL) (60 days' incarceration and 36 months' probation where the defendant witnessed rioters clashing with police officers on the Capitol Grounds); *United States v. William Tryon*, 1:21-cr-00420 (RBW) (50 days' incarceration where the defendant disregarded directions by police officers and remained inside the Capitol until he was forced to leave).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence.  Balancing these factors, the government recommends that this Court sentence Pamela

Anne Hemphill to 60 days' incarceration, 36 months' probation, 60 hours of community service and $500 restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing her early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:        */s/ Katherine Nielsen*
KATHERINE NIELSEN
Trial Attorney, Detailee
United States Attorney's Office
District of Columbia
D.C. Bar No. 491879
555 4th Street, N.W.
Washington, D.C. 20530
(202) 355-5736
Katherine.Nielsen@usdoj.gov