UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,      .
                               .
            Plaintiff,         .  CR No. 21-0555 (RCL)
                               .
     v.                        .
                               .
PAMELA ANNE HEMPHILL,          .  Washington, D.C.
                               .  Tuesday, May 24, 2022
            Defendant.         .  11:06 a.m.
. . . . . . . . . . . . . . . . .


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Government:          SONIA MITTAL, AUSA
                             U.S. Attorney's Office
                             601 D Street NW
                             Washington, DC 20530
                             (202) 252-7566


For Defendant:               NATHAN I. SILVER II, ESQ.
                             Law Offices of Nathan I Silver
                             6300 Orchid Drive
                             Bethesda, MD 20817
                             (301) 229-0189


Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001
                             (202) 354-3186



Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

(Via Videoconference)

THE DEPUTY CLERK:  This is Criminal Case No. 21-555,
United States of America versus Pamela Anne Hemphill.
On behalf of Probation, we have Crystal Lustig.  Counsel,
please identify yourself for the record, beginning with
the government.

MS. MITTAL:  Good morning, Your Honor.  Sonia Mittal
for the United States.

MR. SILVER:  Good morning, Your Honor.  Nathan Silver
appearing for Ms. Pamela Hemphill, and she's here.

THE COURT:  Okay.  Ms. Hemphill, can you hear me okay?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  Ms. Hemphill, first I apologize to
you and to counsel that the trial I was in last week ran into
problems; and I know you were here for the -- for going
forward with this, and at the last minute we had a glitch and
couldn't do that.  So I appreciate you agreeing to do this by
video today.

I'm sorry that this didn't work out last week, because
I know you traveled all the way here to be here for the
sentencing, and I just couldn't fit it in with the way other
things developed in that trial and other problems that
developed last week.  But I appreciate your being responsive
to the rescheduling easily for this week so we could

1    go forward.  So I apologize for your wasted trip across

2    the country.  I know that's an imposition on everyone.

3    I regret that happened that way.

4         THE DEFENDANT:  Well, Your Honor, no apology.  I

5    did not have to go there.  No, I was here in Boise, Idaho.

6         THE COURT:  Oh, you were.  Okay.  I thought you were

7    here and that you had really wasted a lot of time and travel.

8    I'm even gladder, then.

9       Okay.  Are there any disputes over the presentence report

10   that I need to resolve, first from the government?

11        MS. MITTAL:  None from the government, Your Honor.

12        THE COURT:  And Mr. Silver?

13        MR. SILVER:  No, Your Honor.

14        THE COURT:  All right.  And under the presentence

15   report, since the guidelines are just statutory and not

16   actually applicable, the maximum anyway is set forth in

17   the report.  So I'll let the government allocute first, and

18   then I'll hear from the defense attorney and then from the

19   defendant.

20        MR. SILVER:  And, Your Honor, if I could maybe correct

21   what I said.  The only dispute that we had related to language

22   that appeared, I believe, in paragraph 40 on page 9 that

23   recited information about a prior contact with the police.

24      It didn't result in any criminal prosecution of

25   Ms. Hemphill, but I objected to the language; and the

1    objection was noted, but the language itself was not changed.

2    I thought that it presented Ms. Hemphill in a false light,

3    because it said that she tried to cast blame on others for

4    what was apparently the theft of a Charlie Brown storyboard

5    by Charles Schulz, an original that was quite valuable.

6        And since no one was ever arrested in that case and there

7    were other people living in the house or the residence where

8    Ms. Hemphill then resided, I thought it was just unfair for

9    that to appear in the presentence report even if it was

10   something that appeared in a police report from -- I think

11   it was Oregon, not Idaho.  So my request, and I think I

12   put that in my sentencing memorandum, was that the Court

13   actually excise that language.

14           THE COURT:  That one sentence?

15           MR. SILVER:  I'm sorry, Your Honor?

16           THE COURT:  Just take out that one sentence:

17   "She tried to cast blame"?

18           MR. SILVER:  That's exactly right.

19           THE COURT:  That'll just be deleted.

20           MR. SILVER:  Thank you, Your Honor.

21           THE COURT:  I'll just note that in the court record,

22   then, that that sentence will be deleted from the report.

23       Okay.  Go ahead.  The government can go ahead with your

24   allocution.

25           MS. MITTAL:  Thank you, Your Honor.

1       The government won't belabor its presentation in this

2   case.  The significance of what happened on January 6, for

3   all of those involved and for this country, is clear, and

4   the government has set forth the facts of this case outlined

5   in its memorandum and in 118 minutes of video taken by the

6   defendant and submitted to the Court as an exhibit.

7       The government would just like to highlight two aspects

8   of the defendant's conduct that set it apart.  First, this

9   was a defendant that repeatedly turned to police for help

10  while simultaneously undermining their efforts; and second

11  and perhaps uniquely, the defendant bragged about breaching

12  another capitol, saying, We broke the same glass in Boise,

13  Idaho.  In the government's view, these aspects of the conduct

14  put this defendant's conduct in a different category.

15      Turning to the first point, the defendant's reliance

16  on the police for protection while undermining them.  Many

17  individuals lawfully protested on January 6, and many other

18  individuals protested without directly engaging the police,

19  but this defendant did not choose to take things in from a

20  distance.  In fact, she consistently chose to put herself at

21  the very front lines of the violence.

22      Government Exhibit 3 is a twenty-minute video taken by

23  the defendant from just behind the barriers on the East Plaza.

24  With the Court's permission, the government would like to play

25  two one-minute clips of the video.

1          The video shows a tense standoff between police and an

2     increasingly volatile crowd.  The defendant was aware of the

3     potential for violence and repeatedly stated that the crowd

4     was going to push through the barriers if things went bad,

5     and, shortly thereafter, the crowd did begin to push through

6     those barriers.

7          At that point the defendant indicated that she was scared,

8     and she sought out the protection of the police, citing the

9     fact she was a journalist and that she had recently had

10    surgery, and the police obliged.  They put her under their

11    protection.  And from that position of safety, the defendant

12    filmed violence against that police.  And from that position

13    of safety, more disturbingly, the defendant encouraged the

14    crowd to advance forward.

15         And so here the government would like to begin playing

16    its one-minute clip, the first one-minute clip, and that will

17    be Government Exhibit 3 at minute 13:45.  Just one moment.

18    Can everyone see the screen?  If anyone is unable to hear the

19    audio, please let me know.  And beginning playing at 13:45.

20         (Video played.)

21         And at this point I will move to 15:15 in Government

22    Exhibit 3.

23         (Video played.)

24         Your Honor, I'm ending at 16:51 in Government Exhibit 3.

25    What this video shows is that, from a position of safety,

the defendant egged on the crowd, saying, "You just gotta come in" and "It's your house."  And when another officer offered her protection, she falsely stated that she had tried to calm down the crowd.

Your Honor, these are not the actions of a citizen journalist.  These are the actions of a rioter.  At this point, one might have thought that the defendant would have turned around, but she continued forward.

Government Exhibit 4 is a twenty-minute video taken by the defendant, which shows the crowd breaking through those barriers and racing towards the East Rotunda doors.  And with the Court's permission, the government would like to play one last clip that shows the defendant filming the police, in full retreat, racing to secure the East Rotunda doors.  And with the Court's permission, I'll begin playing at minute 4:40.

(Video played.)

Your Honor, stopping at minute 7:40 in Government Exhibit 4, what that video, Your Honor, shows is that by that point the police were clearly under attack.  The defendant filmed the police's retreat and made her way to the very front of the line that the police had hastily arranged on the stairs in an attempt to protect the East Rotunda.

When the situation became unstable, the defendant again asked for help from the police, and again the police obliged, even though they were under attack.  After relying again on

the police for her safety, the defendant disregarded their
instructions and in fact entered the Capitol.  In fact, she
bragged about it, about being amongst the first.  And again,
inside, officers came to her aid, escorting her out.

Perhaps uniquely, the defendant compared her actions on
January 6 to her actions in an incident with police at the
Boise, Idaho, state capitol on August 24, 2020.  There she
told a rioter on January 6 that "We broke the same glass in
Boise, Idaho."  Again, the government submits that these are
the actions of a rioter, not a citizen journalist.

And nor were they idle words.  The defendant recorded
her participation in the incident at the Idaho Capitol, as
submitted in Government Exhibit 11.  From the government's
perspective, this underscores an unusual need for deterrence
in this case, concerns that are amplified by the defendant's
statements to the FBI including a statement that she had been
pushed into the Capitol.

The government acknowledges the defendant's lack of
criminal history and the circumstances that are described in
the PSR.  The government also acknowledges that the defendant,
after being escorted out of the Capitol, sought to prevent
other rioters from entering the Capitol, though only after
she had understood to be the case that the former president
had instructed the crowd assembled to stand down.

These actions are to the defendant's credit, but, in the

1   government's view, they come too late.  Without individuals

2   like the defendant, the Capitol would not have been breached,

3   and officers would not have been harmed.  This defendant

4   repeatedly asked the police for help while consistently

5   undermining their efforts.  And in doing so, this defendant

6   needlessly drew resources away from the police at a time

7   that they were desperately needed.

8        For that reason, and for the reasons submitted in the

9   government's memorandum, the government requests a sentence

10   of 60 days' incarceration, 36 months of probation, 60 hours

11   of community service, and $500 of restitution.  Thank you.

12           THE COURT:  All right.  Thank you.

13        Mr. Silver?

14           MR. SILVER:  Thank you, Your Honor.

15        Your Honor, this is a situation involving a person who,

16   even in her late years, is still active as a -- what she

17   considers to be a citizen journalist.  But it's true, too,

18   that she's an activist.  She has great patriotic feelings for

19   the country.  She actually has great respect for the police.

20   Even on this day, she felt and she expressed early on that

21   the police, she felt, had saved her life.

22        The Court has seen the video in which she was caught

23   beneath the movement of the crowd, of which many of its

24   members had really become a mob, no longer a crowd, and

25   she was up not only by protesters in the crowd, but also

1    by the police themselves, and she feels grateful, and

2    she feels a sense of gratitude towards them.

3        It would be nice to think she got carried away.  I'm

4    not going to argue that point, that she was carried away

5    by this event, but one of the problems with an event like this

6    is that people can have different motives for participating;

7    but when they get together, it becomes very combustible.

8        There's a book by a sociologist, Edward Banfield, from

9    the University of Chicago, called *The Unheavenly City,* which

10   he wrote in '66 and revised it in 1974, and he studied, among

11   other things, riots and how they develop.  And he described

12   four different kinds of riots:

13       One would be a rampage, which would be kind of like a

14   fight or release of animal spirits among young people, mostly

15   among young males.

16       He describes looting, what we call forays of pillage,

17   where there's an absence or a vacuum of police authority:

18   people would take advantage of that; people would do things

19   that they'd never think of doing before.

20       Another thing would be an outburst of righteous

21   indignation.  Perhaps some of the riots -- the outbursts that

22   happened after the George Floyd death and his custody could

23   be characterized as that.

24       And the last one would be a demonstration, something that

25   was spontaneous and not planned.  Well, this was a planned

demonstration.  We know that.  But one of the points that
he makes is that you can have something start as one thing
and it become another.  You have people getting together with
different motives, and all of a sudden they combine to produce
a terrible, terrible, effect.

In this case, that was the riot at the Capitol.  And, of
course, there were people who meant to prevent the counting of
the electoral votes so that Joseph Biden would not be elected
president, and there were people who had that aim.

I think one of the saddest things about this case came
in part of the video that Your Honor saw in which there were
people who were held back very far in that parking lot at the
Capitol, hundreds of yards away from the Capitol, and some of
them just wanted to get to the Capitol steps.

And Your Honor heard the man say, you know, "We got here.
This is what we wanted."  And there were people who just
stopped there and were prepared to stop, and yet we saw that
others kept going, and who knows how many others meant to
stop, then kept going.

I can't read Ms. Hemphill's mind.  I know what she said.
I've presented that in my memorandum.  But I think it's
almost like -- the sense of frustration would be almost
like the tree that falls in the forest; does it make a sound.
I think many people in the crowd, they just wanted to get
close to the Capitol, make their voices heard and be done

1    with it.  Others didn't have that aim.  Others kept going.

2    And Ms. Hemphill either followed the crowd or was a part

3    of it and helped urge it on.

4        At the same time, she didn't harm the police while she was

5    there.  She made no effort to do that.  Many people in the

6    crowd of protesters -- or in the mob if you want to call

7    it that -- would tell the police, "We back the blue.  This isn't

8    about you."  I've seen other videos where people in the crowd

9    would heckle the police and say, "What are you doing this for?

10   This is treason."

11       The whole thing is just terribly, terribly upsetting,

12   especially to me as a lawyer, because my job is to do what

13   I can for my clients, while at the same time I have to obey

14   the law.  I take that very, very seriously.

15       They say there's strength in numbers.  Well, there's danger

16   in numbers, too.  And by so many people being together in

17   that situation, they created a very dangerous condition that

18   overwhelmed the police.

19       It's unfortunate.  I know Ms. Hemphill will address this

20   herself.  She -- and maybe this is where she did get carried

21   away when she said, "We did this in Boise."  She wasn't actually

22   part of breaking a window or breaking things in that Idaho

23   event, but she has told me about it, and she may speak to Your

24   Honor about that too.

25       But it wasn't that she felt that that was the right thing

to do, but I think she got carried away with the momentum and all of the excitement and she said things that she never should have said, and she may have provided encouragement that she now regrets.

She also has tried to help the police in Boise from time to time.  In fact, she even said she was doxxed, to use the current word.  Her personal information was given out.  Someone hijacked her Facebook page, put information on it that was false.  But I'm not going to say that that's a price that she's paid for what she has done here today.  I can't gainsay the government's request for punishment in this case.

At the same time, given her age and her medical situation, also her successful defeat of alcoholism for the past 40, 42 years in making the AA meetings and going every day, my only request is that the Court fashion a sentence that would take those things into account.

I think home confinement would be appropriate in the circumstances.  The Court has other options available. It's likely not a case where there would be straight probation. I'll leave that to Your Honor.  But those are really the points that I want to make in speaking for Ms. Hemphill.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Silver.

Ms. Hemphill, I know you would be nervous at a time like this, but anything you want to say, I'm certainly interested

1    in hearing.

2         THE DEFENDANT:  First, Your Honor, I'm really sorry

3    that I'm even here.  Can I read something to you that I wrote?

4         THE COURT:  Sure.  Sure.

5         THE DEFENDANT:  I can make this statement in less than

6    a minute.

7      Your Honor, I'd like to thank the attorneys involved in

8    this case, Mr. Silver and Ms. Nielsen, for their time and

9    energy in trying to reach a fair conclusion as to what

10   occurred that day.  I fully regret everything I said and did

11   at that Capitol.

12     When I said, "We did this in Boise," everything was going

13   so fast, I needed to finish it.  They went too far in Boise.

14   It was an officer and some protesters were pulling on a door,

15   and it broke by accident.  It was a terrible thing that

16   happened.  But I was on Facebook, and I had people that knew

17   me, and I wasn't finishing sentences because they knew what

18   I was talking about.

19     I regret everything I said and did at that Capitol.  Not

20   to excuse my actions, but my intentions were to record what

21   was going on, not to be a part of it.  It was as if I were at

22   a football game, cheering on the teams from the stands, but

23   then the fans started going onto the field.  I should have

24   gone home.  But I was there filming the chaos when I never

25   should have left the stands in the first place.

1       I fully regret getting on that plane.  If I knew what

2  was going to happen, I would have never gotten a ticket.

3  The anxiety, the fear, and the chaos that has occurred in the

4  Capitol, those officers should have never had to go through

5  that, and I apologize if I caused them any harm.  They should

6  be honored forever.  They saved my life.  I'm sorry.  Your

7  Honor, if I'd had a crystal ball...

8       Your Honor, I'd like to thank your court for allowing me to

9  make this statement.  Alls I know is I heard a man saying next

10  to me: They're letting us in.  Hold on.  It's on my video.

11  They're letting us in, and I'm excited.  They're going to let

12  us in legally.  Because I -- you don't push barriers.  You do

13  not touch cops.

14       So I'm thinking, everybody's excited and they just pushed

15  in too fast the first time.  So I'm going around saying "get

16  in" because I thought they're letting us in.  My mind wasn't --

17  I look back and I'm thinking, what was I thinking?  I thought

18  they were letting us in.  I would say, "Come on in."

19       God, to think that that could have caused any problems.

20  I'm so sorry.  I was trying to be a part of the solution, not

21  the problem, but I ended up being part of problem.  I wanted

22  to, as my therapist would say, quit trying to catch the bad guy.

23  I thought anything I could video would be helpful to FBI or

24  police if it's on my video.  I've got this thing about I have

25  to video everything, you know.

1    When I saw that man taking that book out of the glass window,

2    I told him to put it back.  And he did.  And then when I saw

3    that -- I don't remember his name, but that Buffalo man, I

4    recorded that because I thought that could be helpful in court.

5    And then I saw him go up there, and I thought, oh, no, they're

6    not going back up there to get in that door, are they?  So I

7    followed them to record what they're saying again, and then

8    that's when I heard the president said to leave.

9        So I stood there at that door, and I said to the cops behind

10   me, "Nobody's coming back through this door.  They have to come

11   over my body."  I'm thinking I'm a marine with an AR or

12   something.  I lost my mind.  I just thought I wanted to protect

13   the Capitol.

14       And, to this day, I don't even want to tell people I was

15   there.  I'm so ashamed that I was even there.  I mean, I wanted

16   to support our country, but not like that.  I mean we don't do

17   that.  That's not a patriot.  And I've told everybody: if you

18   didn't back the blue that day, don't call yourself a patriot.

19   This should never, ever happen in America again, ever.  Somebody

20   -- I'm sorry, Your Honor.

21       I'm sorry.  Excuse me.

22       That's all I have to say, Your Honor.  Thank you very much

23   for your time.

24           THE COURT:  Well, that was very well said,

25   Ms. Hemphill.  I have to say, it was a sad day for our

1    country.  I have to also say that as tempting as it is to

2    be lenient in this kind of situation, what I have discerned

3    is it's such a serious offense because it's such a serious

4    event in the history of our country, that I have to agree

5    with the government's recommendation in this case.

6      I believe that there has to be a penalty when there is a

7    serious offense like this.  It doesn't equate to other kinds

8    of demonstrations where 10 days in jail or even 30 days in

9    jail are conditions.  You did everything right from the time

10   Mr. Silver came in representing you.  You worked out a plea

11   agreement here, and I'm not going to go above what the

12   government is suggesting is appropriate in this case.

13     But I do think that the seriousness of the nature of

14   what occurred in this case -- the very first one of these

15   sentencings I did, I did a sentence of probation, and it

16   turned out to be a serious sentencing error on my part.

17   The defendant seemed contrite at the time and the next

18   day made statements on national television that were

19   embarrassing to me as well as her, and it turned out I

20   have a hard time discerning the sincerity.

21     I find what you're saying to me to be sincere today.

22   I believe you.  But it's very hard, under these circumstances,

23   to test the sincerity of what you're telling me today, you know?

24   And sitting in my position, it's very hard to tell.

25     I have those videos where you're egging the crowd on.

1    It's very hard to overcome that, and it's very hard to for a
2    court to do the right thing in this kind of a case.  In some
3    ways, when I see those videos, I want to give you the maximum.
4    You understand where I'm coming from.  I also know that you
5    appear to me to be a sincere person who knows you made a
6    mistake, and I want to try to be fair.

7        So I'm going to do what I think will be a fair sentence.  I
8    can't justify for anyone that ended up in your posture here to
9    just walk away.  The public doesn't accept that either.  The
10   public has a right to expect that judges are going to mete out
11   justice in a way that shows the seriousness of the offense here.
12   And you said that yourself.  You understand this was a serious
13   matter.  In the history of our country, it's a serious matter.

14           THE DEFENDANT:  Yes.

15           THE COURT:  The public thinks it's a serious matter.
16   There's some people that think this was a patriotic matter;
17   and it might have started out that way, but it sure didn't
18   end up that way.  And that's what you just said, and I like
19   what you just said.  I applaud you for what you just said.

20       Pursuant to the Sentencing Reform Act of 1984, in
21   considering of the provisions of 18 U.S.C. § 3553, it is the
22   judgment of the Court that you're hereby sentenced to a term
23   of 60 days on Count 4.  In addition, you are to pay a special
24   assessment of $10 in accordance with 18 U.S.C. § 3013.  The
25   Court authorizes supervision but not jurisdiction.  This case

1   transferred to the District of Idaho.

2       You'll be placed on probation for a term of three years -

3   36 months.  While on probation, you'll abide by the mandatory

4   conditions of probation as well as the standard conditions:

5   not to commit another federal, state, or local crime, not to

6   unlawfully possess a control substance, refrain from unlawful

7   use of a controlled substance, submit to one drug test within

8   15 days of placement on probation upon release, do periodic

9   drug tests thereafter, make restitution in the amount of $500

10   in accordance with 18 U.S.C. § 3663 and 3663A.

11       The Court finds you do not have the ability to pay a fine,

12   waives imposition of a fine in this case, and also waives any

13   interest on the amount of restitution.  Restitution to the

14   Architect of the Capitol in the amount of $500 is also

15   imposed.  Restitution payments shall be made to the Clerk of

16   Court, U.S. District Court, for disbursement to the Architect

17   of the Capitol, Office of Chief Financial Officer, Attention:

18   Kathy Sherrill, CPA, Ford House Office Building, Room H2-205B.

19       Having assessed this defendant's ability to pay, payment

20   of the total criminal monetary penalties are due in equal

21   monthly installments of $50, to commence the day after the

22   judgment, and provide verification to the probation office.

23       Financial obligations are payable to the Clerk of Court,

24   U.S. District Court, 333 Constitution Avenue NW, Washington,

25   D.C. 20001.  Within 30 days of any change of address, you

1    shall notify the Clerk of such change until such time as

2    the financial obligation is paid in full.

3        Probation office shall release the presentence

4    investigation report to all appropriate agencies, which

5    includes the probation office in the approved district of

6    residence, in order to execute the sentence of the Court.

7    Treatment agencies shall return the presentence report to

8    the probation office upon the defendant's completion or

9    termination from treatment.

10       You may have the right to appeal the sentence imposed

11   by the Court.  If you choose to appeal, you must do so within

12   14 days after I enter judgment.

13       As defined in 28 U.S.C. § 2255, you also have the right

14   to challenge the conviction entered or sentence imposed if

15   new or currently unavailable information becomes available

16   to you on a claim that you received ineffective assistance

17   of counsel in entering the guilty plea or in connection with

18   the sentencing.  If you're unable to afford the cost of an

19   appeal, you may request permission from the court to file an

20   appeal without cost to you.

21       Pursuant to the D.C. Circuit opinion in *U.S. v. Hunter*,

22   does either counsel have any objection to the sentence

23   imposed that's not already noted on the record?  Mr. Silver.

24           MR. SILVER:  No, Your Honor.

25           THE COURT:  The government?  You're on mute.

1          MS. MITTAL:  I apologize, Your Honor.  No, Your Honor.

2          THE COURT:  Any remaining counts to dismiss on motion

3     by the government?

4          MS. MITTAL:  Thank you, Your Honor.  The government

5     moves to dismiss counts 1 through 3 of the information.

6          THE COURT:  All right.  So ordered.

7       So I assume, Mr. Silver, that we'll let the defendant

8     report for sentencing once there's a designation of a facility.

9     Do you have any other recommendation you want me to make?

10         MR. SILVER:  Yes, Your Honor.  One is that if --

11         THE COURT:  I don't actually know what they're going

12    to do about a designation, so I don't know if they'll

13    designate if there is even something in Idaho they can --

14    if they designate a county jail or something like that or

15    what they do.  I don't honestly know.

16         MR. SILVER:  Here's what I would like to do, and that

17    is no recommendation right now.  I'll speak with Ms. Hemphill.

18    I know in other cases there are some facilities that have

19    special medical resources, but that doesn't mean the Bureau

20    of Prisons is going to follow it.  I've had them disregard

21    recommendations also.

22         THE COURT:  It may be I could recommend Carswell or

23    something like that.  I don't know what the -- that's probably

24    the only female medical facility I can recommend.

25         MR. SILVER:  I think that probably would be wise.

1    Is that Carswell, Nevada?

2            THE COURT:  No.  It's in Texas, I think.

3            MR. SILVER:  Texas?  Why don't I do this.  If I --

4            THE COURT:  Just contact my chambers, and I probably

5    won't sign it for a couple of days --

6            MR. SILVER:  I'll do that.

7            THE COURT:  -- until you find out.  Talk to somebody

8    in BOP.  Talk to Probation first and then maybe somebody in

9    BOP --

10           MR. SILVER:  I will.

11           THE COURT:  -- whatever you can find out would be

12   the best to recommend, and I'll just leave the reporting

13   date open.

14           MR. SILVER:  All right.  That's fine.  And just one

15   other matter.  I'm not sure this can be done.  Does Your Honor

16   wish this to be supervised probation or unsupervised probation

17   given --

18           THE COURT:  It'll be the standard conditions of

19   supervision.

20           MR. SILVER:  Of supervision.  All right.  All right.

21   So I'll speak with Probation and then BOP as necessary.  The

22   real problem that we have, Your Honor, is that the BOP doesn't

23   follow these recommendations of the court.

24       In one instance I had a client before Judge Kotelly, who

25   recommended a community corrections facility, basically a

1    halfway house near where my client lived and near where his

2    10-year-old son lived, and he was sent 250 miles away to a

3    prison.  So you never know.

4         THE COURT:  Well, those kind of halfway houses

5    are frequently overcrowded is the problem with those.

6         MR. SILVER:  No, I understand.  I understand.

7    Unfortunately, I have to explain to clients that the

8    courts can't order BOP to place them in a certain place.

9         THE COURT:  Yeah.

10        MR. SILVER:  Generally.

11        THE COURT:  I understand that, too.  I certainly

12   am willing to recommend whatever you can come up with.

13        MR. SILVER:  I sure will, Your Honor.

14        THE COURT:  Okay.  In the meantime, Ms. Hemphill,

15   I wish you the best.

16        THE DEFENDANT:  Thank you very much, Your Honor.

17   I appreciate you.

18        THE COURT:  Okay.  Mr. Silver, nice job in the

19   meantime, and the government as well.

20        MR. SILVER:  Thank you, Your Honor.

21        MS. MITTAL:  Thank you, Your Honor.

22        THE COURT:  The Court will stand in recess.

23        (Proceedings adjourned at 11:47 a.m.)

24

25

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify

that the foregoing pages are a correct transcript from the

record of proceedings in the above-entitled matter. *


_/s/ Bryan A. Wayne_
Bryan A. Wayne


* PLEASE NOTE:

This hearing was taken via videoconference in compliance with
U.S. District Court standing order(s) during the COVID-19
pandemic.  Transcript accuracy may be affected by the use
of electronic technology, including but not limited to sound
distortion and audiovisual interference.